## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.    JAYSON JEFFREY PENN,
2.    MIKELL REEVE FRIES,
3.    SCOTT JAMES BRADY,
4.    ROGER BORN AUSTIN,
5.    **TIMOTHY R. MULRENIN**,
6.    WILLIAM VINCENT KANTOLA,
7.    JIMMIE LEE LITTLE,
8.    WILLIAM WADE LOVETTE,
9.    GARY BRIAN ROBERTS, and
10.   RICKIE PATTERSON BLAKE,

      Defendants.

No. 20-cr-00152-PAB

## DEFENDANT TIMOTHY MULRENIN'S MOTION FOR JUDGMENT OF ACQUITTAL

Over 21 days of trial, Defendant Timothy Mulrenin has scarcely been mentioned. Indeed, not *one* witness has implicated him in the charged conspiracy. The government's single supposed co-conspirator witness—Robert Bryant—offered no testimony about Mr. Mulrenin. Of the government's eight fact witnesses from the customer side, five did not mention Mr. Mulrenin at all. The remaining three witnesses testified that Mr. Mulrenin was not heavily involved in the KFC negotiations (Robert Lewis), offered lower prices to secure more volume (Sarah Fisher), and was specifically kept on as a salesman even after reviewing the government's allegations against him detailed in the superseding indictment (Michael Ledford).

The body of the government's testimonial evidence mirrors the sparse, ambiguous and otherwise innocuous documentary evidence offered against Mr. Mulrenin. Even when evaluated

in the light most favorable to the government, the phone calls, text messages, and email

correspondence admitted into evidence permit an inference, at most, that Mr. Mulrenin and other

salespeople then-employed by Tyson occasionally communicated with representatives of other

suppliers about mutual customer accounts. Out of the more than 500 exhibits admitted into

evidence, Mr. Mulrenin appears in less than fifty. The government's attempts to boot-strap the

communications involving Carl Pepper—whom Mr. Mulrenin supervised—to Mr. Mulrenin

similarly fall short, as they also do not support an inference that any of Mr. Pepper's

communications with competitors went beyond legitimate purposes of collecting competitive

intelligence and serving customer accounts. Simply put, there has been no proof offered that any

communications were in furtherance of any unlawful objective, let alone the conspiracy charged.

The government has provided no evidence that Mr. Mulrenin, or any Tyson salesperson, ever

shared final pricing information with a competing supplier, much less that they did so in

furtherance of a conspiracy to fix prices.

Considering the dearth of evidence, the government will invite the jury to stack inference

upon inference to find a conspiracy based on legitimate business communications. No reasonable

jury could find Mr. Mulrenin guilty of knowingly joining the charged conspiracy based on this

body of evidence and in accordance with the law of this Circuit.

## I.    LEGAL STANDARD

### A.    FRCP Rule 29

"[T]he court on the defendant's motion must enter a judgment of acquittal of any offense

for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). In

considering a motion for judgment of acquittal pursuant to Rule 29, acquittal is proper if the

evidence implicating the defendant is nonexistent or is "so meager that no reasonable jury could

find guilt beyond a reasonable doubt." *United States v. White*, 673 F.2d 299, 301 (10th Cir.

1982).  Further, "if the evidence does no more than raise a mere suspicion of guilt or requires piling inference upon inference to conclude the defendant is guilty" the conviction cannot stand. *United States v. Dewberry*, 790 F.3d 1022, 1028 (10th Cir. 2015).

### B.        Sherman Act Section 1

To establish a price-fixing conspiracy under Section 1 of the Sherman Act, the government must establish: (1) that a conspiracy existed between two or more competitors to fix prices and rig bids for broiler chicken products; (2) that the defendant knowingly joined the conspiracy; and (3) that the conspiracy involved interstate trade or commerce. 15 U.S.C. § 1. The government must show that a defendant knew the essential objectives of the conspiracy and shared with his co-conspirators a common purpose or design to circumvent price competition and enhance profitability. *United States v. Metro. Enters., Inc.*, 728 F. 2d 444, 450-51 (10th Cir. 1984); *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 443 n.20, 446 (1978). A conspiracy conviction cannot be sustained by "mere association or unknowing involvement" that creates a suspicion of guilt. *United States v. Funez*, 2014 WL 3707991, at *12 (D. Colo. July 25, 2014) (citing *United States v. Hernandez*, 509 F.3d 1290, 1295 (10th Cir. 2007) ("guilt is always dependent on personal and individual conduct…")); *United States v. Horn*, 946 F.2d 738, 741 (10th Cir. 1991) (One does not "become a member of a conspiracy merely by associating with conspirators known to be involved in crime."); *United States v. Fox*, 902 F.2d 1508, 1514 (10th Cir. 1990) ("Mere association with conspirators, even with knowledge of their involvement in crime, is insufficient to prove participation in their conspiracy.").

Proof of information sharing in the context of normal business practice is not enough to establish that a conspiracy existed. *See Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 859 (10th Cir. 1999); *see also United States v. Suntar Roofing, Inc.,* 897 F.2d 469, 475 (10th Cir. 1990). In fact, when "conduct is consistent with other, equally plausible explanations" in the course of ordinary

3

business, the case law prohibits drawing the inference that price fixing has occurred. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 596-97 (1986). The Tenth Circuit limits drawing inferences of conspiracy when the underlying conduct (i.e., price sharing) is not presumptively unlawful. *See United States v. Carnagie*, 33 F.3d 1231, 1239 n.5 (10th Cir. 2008).

## II. THE GOVERNMENT'S EVIDENCE DOES NOT SUPPORT AN INFERENCE THAT MR. MULRENIN KNOWINGLY JOINED ANY CONSPIRACY

Mr. Mulrenin is charged with a single count of conspiracy to violate the Sherman Act. (ECF No. 101.) To prove this charge, the government must show that Mr. Mulrenin knew the essential objectives of the conspiracy and shared with his co-conspirators a common purpose or design to fix prices or rig bids. However, the government presented no direct evidence to show that Mr. Mulrenin entered into such an agreement, nor did the government present any evidence from a fact witness showing that Mr. Mulrenin communicated with any competitor to achieve such an outcome.

In deciding whether the Government has shown Mr. Mulrenin knowingly joined in a conspiracy to fix prices and rig bids, only evidence about Mr. Mulrenin's actions can be considered—i.e., his own conduct and what he personally said or did. Mr. Mulrenin cannot be found guilty based on what others may have said or done to allegedly join any conspiracy. *Funez*, 2014 WL 3707991, at \*12. There is no evidence that Mr. Mulrenin said or did anything in furtherance of the conspiracy charge.

### A. No Witness Testimony Indicated That Mr. Mulrenin Knowingly Joined Any Conspiracy

The government presented just one witness who claimed to have personal knowledge of the alleged conspiracy, and eight fact witnesses from the customer side of the broiler chicken business. Not a single witness offered testimony implicating Mr. Mulrenin in the conspiracy. Four of these witnesses failed to mention Mr. Mulrenin at all during their testimony.

1.      Robert Bryant (Pilgrim's Pride)

The government called one witness with any supposed personal knowledge of the alleged

conspiracy: Pilgrim's Pride employee Robert Bryant. Mr. Bryant did not mention Mr. Mulrenin's

name during his testimony, and his testimony overall is, at best, of marginal value to support its

theory of the charged conspiracy. While Mr. Bryant testified that, at some point, Jimmie Little

had pricing information that he received from "a person at Tyson Foods," (Nov. 1 Rough Tr. at

109:10-12,) he never identified who that person was or the timing of the communication.

2.      Robert Lewis (RSCS)

Robert Lewis testified as a negotiator during the 2014 KFC/RSCS bid process. He did not

recall Mr. Mulrenin having any role in negotiations with RSCS in 2014. (Nov. 3 Rough Tr. at

94:6-7, 95:5-7.) Mr. Lewis testified about a meeting with Mr. Roberts from Tyson but did not

recall whether Mr. Mulrenin was present. (*Id.* at 100:21-101:1.) Mr. Lewis admitted on cross-

examination that he had "absolutely no direct knowledge whatsoever about . . . Tim Mulrenin

engaging in any conspiracy to fix prices." (Nov. 4 Rough Tr. at 106:22-107:1.)

3.      Michael Ledford (RSCS, Chick-fil-A)

Michael Ledford testified that he worked with both Mr. Mulrenin and Mr. Roberts during

his time at RSCS and Chick-fil-A. (Nov. 8 Rough Tr. at 195:2-19.) Mr. Ledford did not

otherwise mention Mr. Mulrenin's name during the direct portion of his testimony. Mr. Ledford

admitted that he agreed to Mr. Mulrenin continuing to service Chick-fil-A as a salesperson, even

after reviewing the superseding indictment that contained specific allegations relating to Mr.

Mulrenin. (Nov. 10 Rough Tr. at 111:18-112:4.)

4.      Sara Fisher (RSCS)

Sara Fisher testified that she was responsible for sending an email initiating the RFP

process for KFC in 2017. Ms. Fisher sent her email to Mr. Pepper, Mr. Mulrenin, and Tim

Scheiderer at Tyson. (Nov. 4 Rough Tr. at 190: 16-20.) Ms. Fisher explained that Mr. Pepper

was her day-to-day contact at Tyson and Mr. Mulrenin was Mr. Pepper's boss, but that she had

little interaction with Mr. Mulrenin. (*Id.* at 190:21-191:5.) She testified that Tyson's 2017

proposal—submitted by Mr. Mulrenin—reflected a strategy to offer greater discounts for more

volume and would have allowed KFC to scale up in volume to a discount of $.02-.03 per pound,

which translated into several million dollars in savings. (*Id.* at 48:3-25.)

5.    James Olson (RSCS), Telly Smith (Golden Corral), Joseph Brink (Pollo Tropical), Meyer Skalak (Chick-fil-A), and Melissa Hoyt (Sysco)

James Olson testified about negotiations with KFC in 2014, but Mr. Mulrenin's name

was not mentioned. Telly Smith testified about negotiations conducted on behalf of Golden

Corral, but he did not know Mr. Mulrenin. (Nov. 8 Rough Tr. at 142:2-13.) Joseph Brink did not

mention Mr. Mulrenin during his testimony and, on cross examination, admitted that nothing he

testified about had anything to do with Mr. Mulrenin. (Nov. 17 Rough Tr. at 132:2-3.) Meyer

Skalak similarly did not reference Mr. Mulrenin during his testimony, nor did Melissa Hoyt.

**B.    Phone Toll Records Do Not Support an Inference That Mr. Mulrenin Knowingly Joined Any Conspiracy**

The government in its summary exhibits identified only 25 phone calls between Mr.

Mulrenin and colleagues at competitor chicken suppliers during the entirety of the alleged seven-

year conspiracy. (GX 1-1, 2-1, 3-1, 7-1, 10-1, 10-3, 14-1, 14-2, 17-1.) The government

introduced no evidence as to the substance of these calls, and neither the witness testimony nor

documents support an inference that those conversations were conspiratorial. Where chicken

suppliers may confer with other suppliers in the ordinary course of business—to discuss supply

shortages, quality standards, or best practices when converting to NAE products, for instance—

the government calls upon the jury to make inference upon inference, which cannot sustain a

conspiracy conviction. *Bell Atl. Corp. v. Twombly,* 550 U.S. 554 (2007); *Matsushita,* 475 U.S. at

6

596 (finding that inference of independent action is reasonable where "conduct is consistent with other, equally plausible explanations"); *Direct Sales Co. v. United States,* 319 U.S. 703, 711 (1943) ("[C]harges of conspiracy are not to be made out by piling inferences upon inference."). Indeed, Mr. Ledford and Ms. Skalak testified that they expected competitors to have such discussions. (Nov. 9 Rough Tr. at 99-11, 102:2-25-103:1-2; Nov. 10 Rough Tr. at 11-10, 84-85; Nov. 15 Rough Tr. at 91:10-92:4.)

Nor can the jury properly draw conclusions about Mr. Mulrenin's conduct based on the toll records of Mr. Pepper, whom Mr. Mulrenin supervised. Not only is there no evidence regarding the content of the calls involving Mr. Pepper, but there is also no basis to infer that Mr. Mulrenin directed Mr. Pepper to make competitor calls or that he knew that the calls were made in furtherance of any conspiracy to fix prices or rig bids. Further still, the cross examination of the government's paralegal witness, Rachel Evans, revealed how the government's summary charts reflecting phone calls were misleading, calling into question their reliability in supporting such inferences. (*See, e.g.,* Nov. 23 Rough Tr. at 184:10-190:21.)

### C.  No Documents Permit an Inference That Mr. Mulrenin Knowingly Joined Any Conspiracy

The evidence offered against Mr. Mulrenin comes almost exclusively through documents admitted without a sponsoring witness, coupled with select patterns of phone calls and texts featured in its summary charts. (*See* GX 1-1, 2-1, 3-1, 7-1, 10-1, 10-3, and 17-1.) As further explained below, the body of documentary evidence offered by the government as proof of Mr. Mulrenin's involvement in the charged conspiracy—amounting to a fraction of the 500 exhibits admitted—show Mr. Mulrenin on communications that do not suggest anything remotely conspiratorial. The majority of the documents involve Mr. Mulrenin only by virtue of him being copied, without anything more, and do not relate in any way to competitor pricing. The few

documents which do show his awareness that Mr. Pepper sourced potential competitor pricing do not support an inference of any conspiracy to fix prices or that this information was obtained for any improper purpose.

1.      Mr. Mulrenin Was Passively Included on Several Communications That Show No Unlawful Purpose

All of the documents Mr. Mulrenin was copied on were either with customers or were internal, and most made no reference whatsoever to competitor pricing.  None suggest an unlawful purpose or show Mr. Mulrenin encouraging or directing anyone to reach out to competitors to even source pricing information. Several communications identified by the government are merely communications with customers regarding a particular cost or contract, with Mr. Mulrenin as a passive recipient. (*See, e.g.*, GX-114, GX-920, GX-1190, GX-9703, GX-748, GX-1921.) Other communications merely show him included on internal discussions with Tyson colleagues regarding customers. (*See, e.g.,* GX-751, GX- 959, GX-752 to -758.) Lastly, in communications where competitor pricing is discussed, Mr. Mulrenin is silent. (*See, e.g.,* GX-120, GX-220, GX-224.) That Mr. Mulrenin is in possession of such information, as the passive recipient of what appears to be legitimate competitive intelligence, without more, is insufficient to support an inference that he was involved in any conspiracy. *See In re Baby Food*, 166 F.3d at 126 (rejecting inference of agreement from "communications despite lack of independent evidence tending to show an agreement and …uncontradicted testimony that only informational exchanges took place") (internal citations omitted).

2.      Communications Mr. Mulrenin Participated in Were Not Related to Competitor Pricing

The communications in which Mr. Mulrenin actively participates are similarly unremarkable, and fail to show Mr. Mulrenin's participation in any agreement to fix prices or rig bids. For example, GX-1175 is an August 14, 2014 email from Rich Eddington to Mr. Mulrenin

asking for a call to discuss Tyson's submitted cost model. Mr. Mulrenin responds the next day: "Will do." This document is a communication between a supplier and customer; it does not contain any information regarding competitors. In GX-744, from August 2017, Mr. Pepper forwards an RFP from Popeye's for its bone-in chicken to Mr. Mulrenin, who responded that Popeye's appeared to believe Tyson dropped prices more than they actually had. No competitors are referenced in this document, and Mr. Mulrenin is only communicating with other Tyson employees about Tyson's pricing. Other examples of similar non-conspiratorial communications include GX-9703, GX-1177, and GX-9714.

3.      No Communications Support an Inference That Mr. Mulrenin Agreed With Any Competitor To Fix Prices

In the limited communications in which competitor pricing is discussed, there is no evidence that Mr. Mulrenin ever collected or received information to fix prices or rig bids. Indeed, in these communications, Mr. Mulrenin is either a passive recipient (*see* GX-120, GX-220, GX-221, GX-224,) or acknowledges information, but without any indication that the information was used thereafter for the purpose of effecting any agreement. (*See, e.g.,* GX-617.) While the government's apparent theory seems to be that Mr. Pepper gathered competitor information with Mr. Mulrenin's knowledge—or at his direction (despite any evidence supporting this assertion)—such a theory also fails. This alone does not establish the personal knowledge of Mr. Mulrenin. *See Funez*, 2014 WL 3707991, at *12. Furthermore, there is no evidence Mr. Pepper acquired competitor information for any nefarious reason. This cannot form the basis of a conviction against Mr. Mulrenin. *See Mitchael*, 179 F.3d at 859; *Suntar Roofing, Inc.,* 897 F.2d at 475.

### D.   The Evidence Reflected on Summary Charts Do Not Support an Inference That Mr. Mulrenin Knowingly Joined Any Conspiracy

#### 1.   Church's Chicken 2013 Freezing Charge

Summary chart 1-1 outlines the government's evidence regarding the 2013 Church's freezing charge event. No witness testified about this event on behalf of Church's or any of the suppliers. The record contains no evidence that would support an inference that any price fixing or bid rigging occurred related to the freezing charges submitted to Church's by any of the suppliers, including Tyson. As it relates to Mr. Mulrenin, the government's evidence shows that his only involvement was being copied on two emails sent by Mr. Pepper. There is no evidence that Mr. Mulrenin took any action based on these emails. No evidence shows that Mr. Mulrenin knowingly and intentionally joined in a conspiracy to fix prices related to the 2013 Church's freezing charge. *See Horn*, 946 F.2d at 741; *Fox*, 902 F.2d at 1514.

#### 2.   2013 KFC/UFPC Bid Process

Summary chart 17-1 sets out the government's evidence relating to KFC/UFPC's bid process in fall 2013. Notably, the superseding indictment does not allege that Mr. Mulrenin was involved in any price fixing related to this event. (ECF No. 101 at 17-18.) The only reference to a competitor communication involving Mr. Mulrenin on Chart 17-1 is a single phone call with Scott Brady from Claxton on November 1, 2013, the day after UFPC sent out feedback from the Round 1 Poultry RFP. (GX-9716.) The government presented no evidence related to the substance of this phone call, nor to the phone calls Mr. Mulrenin had with his supervisor, Mr. Roberts. No communications from November 1, 2013 suggest Mr. Mulrenin and Mr. Brady discussed pricing information or anything related to an agreement to fix prices or rig bids.

3.      Church's 2013 Quality Assurance ("QA") Charge

Summary chart 2-1 outlines the government's evidence regarding the 2013-2014 QA

charge to Church's Chicken. No witness testified about this event. There is no evidence that

competitors submitted inflated pricing or that competitor pricing was unexpectedly aligned. On

its face, summary chart 2-1 shows that Tyson's pricing was significantly lower than Pilgrim's

and Koch and that it was "popular" with Church's. While chart 2-1 shows that Mr. Mulrenin was

copied on three internal emails between Tyson employees, he makes no statement in the

admitted exhibits and there is no evidence that he took any action based on the emails he

received. There is no evidence showing that Mr. Mulrenin was involved in Tyson's decision-

making process regarding the Church's QA charge.

4.      Chick-fil-A Transition to No Antibiotics Ever ("NAE")

The only evidence presented by the government in summary chart 3-1 is a

communication between Mr. Mulrenin and a competitor about preliminary thoughts on pricing

for conversion to NAE chicken. (GX 356, GX 354, GX 355.) The chart shows that on April 18,

2014, Mr. Mulrenin had a phone call with Scott Brady, after which Mr. Brady sent a text

message to his boss with Tyson's "work in progress" cost pricing assumption for "live weight"

that would be used for Tyson to arrive at a "finished" cost price for NAE chicken. Mr. Brady

also said in the text message that he told Mr. Mulrenin what "we [presumably Claxton] were

doing, Perdue, and Pilgrims." (GX-355.) This text exchange and related calls are the sum total of

the government's evidence of Mr. Mulrenin's involvement in this claimed conspiratorial episode.

Significantly, this communication with Mr. Brady is the only evidence that refers to Mr.

Mulrenin communicating with another supplier about anything relating to price. And it only

involves preliminary thoughts on pricing for NAE chicken weeks before specifications were set

by the customer and Tyson's cost price was quoted. This is not evidence of a *per se* violation. *See Gypsum*, 438 U.S. at 441 n.16.

The government presented no evidence that Mr. Mulrenin's conversation with Mr. Brady resulted in Tyson (or Claxton) altering its price for NAE chicken. In fact, the government presented **no** evidence regarding the prices submitted by Tyson or Claxton for the transition to NAE chicken. (Nov. 15 Rough Tr. at 126:3-18.) Indeed, Mr. Skalak did not express any belief that Tyson (or Claxton) altered its pricing in any way that suggested an agreement between the competitors. (Nov. 10 Rough Tr. at 232:9-17; 233:7-11; Nov. 15 Rough Tr. at 91:12-92:18.) In fact, Mr. Skalak testified that Chick-fil-A understood competitors would likely consult with each other on the change to NAE chicken because it had never been attempted at such a large scale. (*Id.*) Indeed, Mr. Ledford also testified that Chick-Fil-A wanted the suppliers to confer each other about quality and best practices. (Nov. 10 Rough Tr. at 190: 25, 191: 1-20).

### 5. 2015 8-Piece COB KFC/RSCS Bid Process

Summary charts 10-1 and 10-3 set out the government's evidence as it relates the 2015 KFC bid process. Summary chart 10-1 shows that Tyson submitted its round 1 proposal to KFC on August 11, 2014. (GX 1190, 1191.) It then shows a handful of calls four days later between Mr. Mulrenin and his boss, Mr. Roberts, with whom he spoke on a near daily basis. The government chart also shows one call between Mr. Mulrenin and Scott Brady at Claxton. Given that Tyson submitted its proposal four days earlier, this phone call is not evidence supporting an inference that Mr. Mulrenin was in a conspiracy to fix prices with Scott Brady. Moreover, the government has no evidence that Mr. Mulrenin conveyed any information about Tyson's pricing during this call. Indeed, emails quoted later in Chart 10-1 omit any Tyson pricing information. (GX 1035, 1036-1, 9744.)

Summary chart 10-3 shows that RSCS asked Mr. Roberts at Tyson for his final pricing by September 2-3, 2014. There is no evidence as to when Tyson submitted its final proposal. The government presented no evidence showing that Mr. Mulrenin was involved in Tyson's final pricing or that he even knew the pricing that was submitted by Mr. Roberts on behalf of Tyson.

      6.      2017 Popeye's Bone-in Chicken

Summary chart 7-1 outlines the evidence purporting to show an agreement to limit discounts during negotiations with Popeye's in 2017. No witness testified for the government about this event. No witness testified about the pricing submitted by suppliers or expressed any belief that such pricing appeared inflated or otherwise was affected by an agreement among the suppliers. With respect to Mr. Mulrenin, the only evidence involves internal communications with Mr. Pepper. One communication is an email exchange with Mr. Pepper regarding Popeye's impression that prices had dropped more than they had in reality, which has nothing to do with competitor pricing. (GX-744.) Other communications include texts from Mr. Pepper to Mr. Mulrenin regarding what Georges "is doing," (GX-755) and "some info from Popeyes" regarding what "everyone seems to be doing." (GX-751.) Based upon this information, no reasonable juror could find that Mr. Mulrenin knowingly joined a conspiracy to fix prices related to the 2017 Popeye's bid process. There is no evidence that Mr. Pepper acquired this information for the purpose of fixing prices or rigging bids. Indeed, it was a customer—Popeye's—that provided some of the competitor pricing information to Mr. Pepper.

      7.      Pilgrim's Internal Discussions Regarding Tyson Foods

Chart 20-1 captures the intense competition between Tyson and one of its largest competitors, Pilgrim's Pride. It is not evidence of a conspiracy. Chart 20-1 summarizes ten emails sent over during November and December 2014 in which Pilgrim's employees rail against Tyson's business model. Pilgrim's appears particularly frustrated with Tyson's low

prices, and note that Tyson is "selling cheap," "adding market share" due to low prices, and taking business "on price." (GX-2005.) At the same time the government contends Mr. Penn was in an agreement to fix prices with Tyson, Mr. Penn is saying that Tyson should "start making decision commensurate with a profitable venture and not a philanthropic organization." (*Id.*) No reasonable juror could conclude that Mr. Mulrenin at Tyson was in an agreement with Mr. Lovette or Mr. Penn to keep prices high and discounts low.

## III.   CONCLUSION

For the foregoing reasons, the Court should grant Mr. Mulrenin's motion for judgment of acquittal.

Dated: November 29, 2021

Respectfully submitted,

*s/ Elizabeth B. Prewitt*
**Latham & Watkins LLP**
Elizabeth B. Prewitt
Caroline A. Rivera
1271 Avenue of the Americas
New York, NY 10020
Tel: (212) 906-1200

*s/ Jamie Hubbard*
**Stimson Stancil LaBranche Hubbard, LLC**
Marci G. LaBranche
Jamie Hubbard
1652 N. Downing Street
Denver, CO 80218
Tel : (720) 689-8909
Email: labranche@sslhlaw.com

*Attorneys for Defendant Timothy Mulrenin*

## CERTIFICATE OF SERVICE

        I hereby certify that on this 29th day of November, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send electronic notification of such filing to all counsel of record.

*s/ Jamie Hubbard*
Jamie Hubbard
